**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                                                                **16-CR-93-G**

                    **-v-**

**ARTHUR JORDAN,**

                    **Defendant.**
_____


## REPORT, RECOMMENDATION, AND ORDER

            This case was referred to the undersigned by the

Hon. Frank P. Geraci, Jr. in accordance with 28 U.S.C. § 636(b)(1), for all pretrial

matters and to hear and report on dispositive motions.  Dkt. No. 7.


## PRELIMINARY STATEMENT

            The defendant, Arthur Jordan ("Jordan" or "defendant"), is charged in a

single-count Indictment with transmitting in interstate commerce a threat to injure one or

more police officers in violation of 18 U.S.C. § 875(c).  Dkt. No. 6.  This charge is

predicated on a post Jordan published on his Facebook page, "Let's Start Killin Police

Lets See How Dey Like It [sic]" in July of 2016.  Dkt. No. 6.  On September 27, 2016,

defendant filed an omnibus motion seeking to dismiss the indictment on various

grounds, Dkt. No. 10, pp. 14-18, and to suppress the content of his Facebook page,

physical evidence, statements, and the fruits of a search warrant, Dkt. No. 10, pp. 8-14.

After oral argument on the motions on October 19, 2016, the undersigned denied as

moot defendant's discovery demands.  Dkt. No. 15.  On December 8, 2016, this Court

held a suppression hearing at which Buffalo Police Officers Michael Acquino and Mark

Hamilton testified, and surveillance footage of Jordan's search and arrest at a PCS

Metro Store was shown.  Minute Entry 12/08/2016.  The hearing was continued on

December 12, 2016, Minute Entry 12/12/2016, after which the parties filed post-hearing

memoranda of law.  Dkt. Nos.  26 & 27.  For the following reasons, it is

RECOMMENDED that defendant's request to dismiss the indictment be DENIED, and

his motion to suppress be GRANTED IN PART and DENIED IN PART.  Dkt. No. 10.


## FACTS[1]

On July 6, 2016, Diamond Reynolds livestreamed on Facebook a video of

her boyfriend, Philando Castile, dying in his car after being shot by a police officer

during a traffic stop near St. Paul, Minnesota.  *See* Melissa Chan, *"Philando Castile*

*Was a Role Model to Hundreds of Kids, Colleagues Say,"* TIME MAGAZINE (July 7, 2016),

http://time.com/4397086/minnesota-shooting-philando-castile-role-model-school/.[2]  The

video soon went viral.  Reynolds told reporters after that her boyfriend, who was black,

was complying with the officer's instructions to put his hands in the air and get his

license and registration when the officer opened fire into the car, striking Castile several

---

[1] The following facts are taken from various news sources, Defendant's Omnibus Pretrial Motion
(Dkt. No. 10), the Government's Response to Defendant's Omnibus Pretrial Motion (Dkt. No.
13), the transcripts of the suppression hearing (Dkt Nos. 21 & 22), the PCS Metro recordings of
defendant's search and arrest (Gov't Exh. 1, Def. Exh. 8), and the parties Post-Hearing
Memoranda (Dkt. Nos. 26, 27).

[2] In its search warrant application for defendant's Facebook account, Special Agent Keith E.
Bender of the FBI referred to the "widely reported" shooting deaths of two black men and a local
report of an unsuccessful attempt on a Buffalo police officer's life.  Dkt. No. 10-1, p. 13, ¶ 26.
This Court *sua sponte* located some original source material relating to these events as
background information relating to the charge in the Indictment and has included citations to
those materials herein.

times.  *Id.*  Minnesota's governor, Mark Dayton, told reporters that he was "appalled" by

the officer's conduct:  "Would this have happened if the driver were white, if the

passengers were white? I don't think it would have."  *See* Our Foreign Staff, *"'Would this*

*have happened if the driver were white? Minnesota governor appalled by police*

*shooting of black man,"* THE TELEGRAPH (July 8, 2016),

http://www.telegraph.co.uk/news/2016/07/07/would-this-have-happened-if-the-driver-

were-white-minnesota-gove/.


The day prior to Castile's death, a black man by the name of Alton Sterling

was shot and killed during an altercation with white police officers in Baton Rouge,

Louisiana.  *See* Joshua Berlinger, Nick Vlanecia, and Steve Almasy, *"Alton Sterling*

*shooting: homeless man made 911 call, source says,"* CNN (July 7, 2016),

http://www.cnn.com/2016/07/07/us/baton-rouge-alton-sterling-shooting/.  A graphic cell

phone video of Sterling being restrained and fatally shot spread across social media,

igniting local protests and drawing national attention.  *Id.*  "These are not isolated

incidents," then President Barack Obama said of Castile and Sterling's deaths. "They

are symptomatic of a broader set of racial inequalities that exist in our criminal justice

system."  *See* Alex Johnson, *"Appalled: Minnesota Governor Says Philando Castile*

*Would be Alive if He Were White,"* NBC NEWS (July 7, 2016),

http://www.nbcnews.com/news/us-news/appalled-minnesota-governor-says-philando-

castile-would-be-alive-if-n605496.  President Obama called on Americans to recognize

that "a big chunk of our citizenry feels that because of the color of their skin that they

are not being treated the same." *Id.* He stressed that "[a]ll fair-minded people should

be concerned" about the mistreatment of black people at the hands of police. *Id.*

On or about July 6, 2016, the day of Castile's death, defendant allegedly

posted on his Facebook page "Let's Start Killin Police Lets See How Dey Like It [sic]"

under his username "MacBMW Jordan." Dkt. No. 6. He also "shared" a post authored

by a person with the Facebook moniker "Rio Clarke" that said, "It's just a matter of time

before Fitz or 1 of them fools kill 1 of us." Dkt. #10, p. 4. Based on defendant's privacy

settings, these posts were visible to all of defendant's Facebook "friends" – those

people to whom he gave permission to access his page – of which he had 2,067 in

August 2016, when his Facebook records were produced.[3] Dkt. No. 10, pp. 3-4; Dkt.

No. 13, p. 11. According to defendant's grand jury testimony, many of his Facebook

"friends" were people he had never met before. Dkt. No. 13, p. 12. One such person

was "Rio Clarke" whose "Fitz" post defendant had shared on his own Facebook page.

Dkt. No. 13, pp. 12-13. "Fitz" is believed to be a Buffalo Police Department Officer in

Buffalo's E-District who interacts regularly with a local gang known as the Central Park

Gang ("CPG"). Dkt. No. 10-1, p. 15.

On July 7, 2016, during a peaceful demonstration against the Sterling and

Castile shootings, a "heavily armed sniper" gunned down police officers in Dallas,

Texas, leaving five of them dead. *See* Manny Fernandez, Richard Perez-Pena and

Jonah Engel Bromwich, *"Five Dallas Officers Were Killed as Payback, Police Chief*

---

[3] According to the search warrant affidavit, Jordan had 1,965 friends at the time that law
enforcement took screen shots of the offending posts. Dkt. No. 10-1, p. 14, fn. 1.

*Says,"* THE NEW YORK TIMES (July 8, 2016),

https://www.nytimes.com/2016/07/09/us/dallas-police-shooting.html.  The gunman

specifically set out to kill as many white officers as he could, officials said, in retaliation

for police killing black men.  *Id.*  Of the attack on the Dallas police, President Obama

told reporters, "[w]e will learn more, undoubtedly, about their twisted motivations, but

let's be clear: There are no possible justifications for these attacks or any violence

towards law enforcement."  *Id.*


It was in this political environment that the Buffalo Police Department

("BPD") was made aware sometime in "early July" via a station house TV notice that FBI

Safe Streets wanted to question Jordan about his Facebook page.  12/8/16 Tr. at 20.

According to Officer Acquino, the station house notice showed a picture of Jordan and

reported the content of his Facebook post, his alleged gang affiliations, and that he was

possibly armed and dangerous.  12/8/16 Tr. at 21.  Officers were advised only that

Jordan was "wanted for questioning" by the FBI.  12/8/16 Tr. at 21.  There was no

warrant or directive for the BPD to arrest Jordan, take him into custody, or search him.

12/8/16 Tr. at 21.


Officers Acquino and Hamilton testified that they knew Jordan to be

associated with the CPG and its younger affiliate, the Beamer Boys, 12/8/2016 Tr. at 5,

because they had seen Jordan at locations where CPG members were known to

congregate.  12/8/16 Tr. at 6, 64.  Nonetheless, the officers "always" found Jordan to be

"very cordial," noting that he never made threats or talked back.  12/8/16 Tr. at 6, 65.

Officer Acquino testified that he never knew Jordan to sell drugs, possess weapons, or behave violently.  12/8/16 Tr. at 26, 38, & 47.  Officer Hamilton confirmed that he had never found contraband on Jordan and had never had reason to arrest him as he had always been compliant.  12/8/16 Tr. at 64, 66, & 83.

On July 14, 2016, Officers Acquino and Hamilton were patrolling together around the area of Main and Fillmore Streets on Buffalo's East Side.  12/8/16 Tr. at 7-9, 59-60.  Officer Hamilton spotted Jordan walking south down Main Street with two friends – identified as Malik Wilson and Xavier Harwell – and alerted Acquino.  12/8/16 Tr. at 7, 59-61.  According to Officer Hamilton, when the trio noticed the patrol car, they started to "walk faster," looking back repeatedly and "very nervously" at the police cruiser "to see where we were," and "quickly" turned into a Metro PCS phone store.  12/8/16 at 60-61, 68.  A surveillance video of the Metro PCS store's exterior (Def. Exh. G), however, shows the three men walking at an almost leisurely pace and conversing with one another.  Def. Exh. G., Channel 4, 17:28:19/43:12.[4]  At no point while approaching or entering the store do any of the men turn to look behind them.  *Id.*

Immediately upon the trio's entry into the store, two patrol cars pull up to the curb.  Def. Exh. G, 17:28:37/43:28.  Officers Acquino and Hamilton, now joined by Officers Adam Madorski and Joseph Acquino ("Joseph"), Michael's brother, enter the

---

[4] The footage of the store's exterior is contained on a disc, Def.'s Exh. G, on Channel 4, denoted as "Ch04."  Another video of the interior of the store appears on the same disc on Channel 3, identified as "Ch03."  The surveillance videos display an original time stamp on the top left of the screen but during the evidentiary hearing, the witnesses referred to an internal time stamp displayed at the bottom of the screen.  For ease of reference, this Court will cite both the original time stamp and the internal time stamp.

PCS Metro Store. *Id.* Just weeks before, Joseph had been involved in a foot chase where a robbery suspect pressed a gun into another officer's chest and pulled the trigger as the officer attempted to wrestle the suspect to the ground. *See* Melissa Kory, *"Buffalo Teen Indicted for 'Attempting to Shoot Police Officer,'"* WYRK (8/10/2016), http://wyrk.com/buffalo-teen-indicted-for-attempting-to-shoot-police-officer/?trackback=tsmclip. Luckily, the gun safety was on and the weapon did not fire, allowing Joseph to knock the weapon from the suspect's hand. *Id.* Officer Acquino testified that at the time they entered the PCS Metro store, he was thinking about that terrible incident involving his brother and that "Dallas[5] was extremely fresh in my mind." 12/8/16 Tr. at 31. It "definitely stuck in [Officer Acquino's] mind that somebody was so brazen and would admit that they were willing to kill a police officer." 12/8/16 Tr. at 31.

According to Officer Acquino's testimony, he entered the store with his three fellow officers and walked up to Jordan, who was leaning against the service counter with his left side, facing the front door of the store. 12/8/16 Tr. at 11-12. As he approached Jordan, he testified, he noticed that Jordan put his back against the counter and began gripping the counter tightly "like a white knuckle." 12/8/16 Tr. at 4.

In the PCS Metro video, Gov't Exh. 1,[6] Jordan can be seen in a grey t-shirt, 12/8/16 Tr. at 12, leaning back – seemingly casually – with his left hip against the counter before the officers enter the store. Gov't Exh. 1, 17:28:42/:26. Xavier Harwell, in a white tee shirt, 12/8/16 Tr. at 13, pulls out some bills and starts a conversation with

---

[5] This refers to the July 7, 2016 shooting of police officers in Dallas, TX, referred to herein.
[6] This video is filmed from behind the counter and has no sound.

the PCS Metro clerk.  Gov't Exh. 1, 17:28:42/:26.  Malik Wilson, wearing a blue shirt,

12/8/16 Tr. at 12, sits down on a chair and appears to be texting on his phone.  Gov't

Exh. 1, 17:28;42/ :26.  The four officers enter the door at the front of the store and fan

out, obstructing any exit through the front door.  Gov't Exh. 1, 17:29:00/:45. Hamilton,

the only black officer of the four, can be seen putting on gloves.  Gov't Exh. 1.,

17:29:28/1:14; Def. Exh. G, Channel 3, 17:29:15/1:01:28.  Jordan continues to lean

against the counter with his hands, clearly visible, spread to either side of his body

facing the officers.  Gov't Exh. 1, 17:29:28/1:14.  Officer Acquino immediately engages

Jordan in conversation, pulls up the front of his shirt, and pats the front area of his body.

Gov't Exh. 1, 17:29:33/1:18.  Officer Joseph searches Malik Wilson and directs him to

leave through the front door.  Def.'s Exh. G, Channel 3, 17:29:32/1:01:45.  Officers

Acquino and Joseph then search Harwell, who raises his shirt, and allow him to move

away from the counter toward the front of the store.  Gov't Exh. 1, 17:30:00/1:48.


         Officer Acquino testified that he was suspicious that Jordan was armed

due in large part to his friends' nervousness, criminal histories, and behavior.  "The

other two individuals just very telling, very nervous, giving signs we've seen throughout

the years that somebody in this situation had something or has some sort of

contraband."  12/8/16 Tr. at 16.  Specifically, Officer Acquino testified that Wilson was

pretending to talk on his cell phone, which was "black," "no name, nothing;" Harwell was

initially engaged in a "nonsensical" conversation with the cashier; and when things

began to escalate with Jordan, he spontaneously lifted his shirt twice to show that he

was unarmed.  12/8/16 Tr. at 13-14, 22-23.  "I've had multiple occasions where

8

somebody else likes to insert themselves in the situation that they're technically not involved in to take away from somebody else in that situation." 12/8/16 Tr. at 23. Officers Acquino and Hamilton noted that Wilson had been arrested with a revolver two years prior, and that they had seen Harwell loitering with other CPG members. 12/8/16 Tr. at 29, 64.

The video seems to tell a different story. Based on the logistics of the store, it is impossible that Officer Acquino could have seen Wilson's cell phone, which was on the other side of a display island with the screen facing away from the officer. Moreover, at one point in the surveillance, Wilson's phone is visibly lit up, suggesting that he was actually on a call or otherwise using it, and not "black" as Acquino testified. Gov't Exh. 1; 17:29:02/:47; *see also* Def.'s Exh. G, Channel 3, 17:29:08/1:01:21. Regarding Harwell, the video shows him conversing with the Metro PCS clerk before the police even enter the store and the clerk typing something into the computer. This suggests that the conversation was not "nonsense" or mere theater. That Harwell was distracted by the imposing police presence in the small store is not surprising. Even the Metro PCS clerk, who had no connection to Jordan, is clearly distracted from his conversation with Harwell by the exchange between Jordan and Officer Acquino.

Rather than "inserting" himself into the "situation" with Jordan, it appears that Harwell was actually trying to remove himself from it. Harwell was against the counter, just a couple feet from Jordan, and Officers Acquino and Joseph. Four officers stood between him and the Metro PCS exit. As such, Harwell could not simply exit the

store without engaging them.  Moreover, Harwell does not lift his shirt spontaneously, as
Officer Acquino testified, but in apparent response to officer requests.  The first time,
Officers Acquino and Joseph say something to Harwell, he lifts his shirt, and both
officers pat him down.  Gov't Exh. 12, 17:29:55/1:38.  As Harwell starts to leave, Officer
Hamilton says something to Harwell, prompting him to lift his shirt again.  Gov't Exh. 1,
17:30:15/1:59; Def.'s Exh. G, Channel 3, 17:30:17/1:02:29.  Harwell ultimately leaves
the store and does not come back.  Def.'s Exh. G, Camera 3, 17:30:27/1:20:39.

        Officer Acquino testified that not wanting to alarm Jordan that the FBI was
looking for him, he told Jordan vaguely "that there is people that want to talk to him
[sic]."  12/8/16 Tr. at 24.  In response, Jordan stated, "I'm not going to comply" and
folded his arms in what Officer Acquino described as a "defiant stance."  12/8/16 Tr. at
24, 83, & 90.  Officer Acquino testified that "[n]either [Wilson nor Harwell] were fighting
like this," and it made him wonder "what is on [Jordan's] right side."  12/8/16 Tr. at 26.
Officer Acquino described his suspicion that Jordan was armed as "a pretty good
guess."  12/8/16 Tr. at 47.  He testified that he was thinking about Dallas and the near-
shooting with which his brother was recently involved when he reached behind Jordan's
back.  12/8/16 Tr. at 30-31.  "[B]efore we use[d] force," he testified, the officers yelled at
Jordan to "stop resisting," so they could flip him over.  2/8/16 Tr. at 32-33.

        The video shows that as soon as Harwell moved away from the counter,
Officers Acquino and Joseph start grabbing at Jordan, pushing him back against the
service counter with enough force to move the counter backwards.  Gov't Exh. 1,

17:30:20/2:05.  Jordan has his hands up in surrender.  *Id.*  Officer Madorski soon joined the other two officers in their apparent effort to flip Jordan over.  Gov't Exh. 1, 17:30:55/2:39.  Although there is no audio, the officers can be seen yelling at Jordan with Officer Joseph mere inches from Jordan's face.  Gov't Exh. 1, 17:31:15/3:00. Officer Hamilton, who had been standing back from the fracas, approached the defendant, yelling.  *Id.*  Officer Joseph then bear hugs Jordan, who still has his hands up in the air, as Officer Acquino reaches around to grab at Jordan's rear.  Gov't Exh. 1, 17:31:24/3:09.  At this point, Officer Acquino testified, he yelled "gun."  12/8/2016 Tr. at 33.  As Jordan is pinned down on the counter with his hands up, Officer Madorski moves around the other officers to spray copious amounts of pepper spray in Jordan's eyes.  Gov't Exh. 1, 17:31:40/3:24.  Officer Joseph then flips Jordan over the counter in a bear hug, Officer Hamilton handcuffs Jordan from the opposite side of the counter, after which Officers Acquino and Joseph punch Jordan in the head.  Gov't Exh. 1, 17:31:40/3:24.  According to Officer Acquino, he "had to [punch Jordan] to effect the arrest."  12/8/16 Tr. at 38.

Jordan was then taken out of the store in handcuffs and placed in a police car.  Dkt. No. 10, p. 5.  Back at the store, the Metro PCS clerk can be seen waving his hand in front of his face to dispel the pepper spray.  Gov't Exh. 1, 17:31:58/3:43.  When that does not work, he leaves the store for a few minutes and then props the door open. Def.'s Exh. G, Channel 3, 17:32:25/1:04:38 through 17:33:04/1:05:17.  While Jordan was still in the cruiser, Officer Hamilton read Jordan his *Miranda* warnings and the officers interrogated Jordan for about a half an hour before bringing him to central

booking.  Dkt. No. 10, p. 5; Def.'s Exh. 1, p. 10.  According to the search warrant application, the arresting officers asked Jordan, "What's with you trying to say you wanna kill cops?," to which Jordan replied, "It is what it is, maybe I wanna kill cops. Y'all look scared.  I had my chance to do what I should've done. . ."  Dkt. No. 10-1, p. 16.   The arresting officers then asked Jordan, "What has any cop ever done to you?," and Jordan replied:  "You see the news.  I should've done some CNN shit.  I would've been all over the news if I would've done what I was thinking about.  I should've just waited at the door for y'all."  Dkt. No. 10-1, p. 16.  Later in the interview, Jordan stated: "I got big balls.  I wanted to go out on CNN.  I had my chance."  Dkt. No. 10-1, p. 16.


Defendant was charged in Buffalo City Court with Criminal Possession of a Weapon in the Second Degree (265.03-2), Resisting Arrest (205.30), and Obstructing Governmental Administration in the Second Degree (195.05).  The following day, July 15, at 10:15 a.m. FBI Agents Christopher DiPasquale and Michael Maiola *Mirandized* and questioned Jordan at the BPD.  Dkt. No. 10, p. 6.  According to the search warrant application, Jordan confirmed that he shared the "Fitz" post and authored the other post because he was mad about what was going on in the country.  Dkt. No. 10-1, p. 17. Based on Jordan's Facebook posts, his possession of a gun, and his statements, FBI Agent Keith Bender applied for and was granted a warrant for Jordan's Facebook account.  Dkt. No. 10, p. 6.  A search of the account yielded numerous photos and other information.  Dkt. No. 10, p. 6.

Defendant now moves to dismiss the indictment and to suppress his Facebook posts; the gun found during the search of his person on July 14, 2016; his statements made immediately following his arrest on July 14, and the following day, July 15; and the evidence found in his Facebook account pursuant to the July 29, 2016 warrant. This Court will address each of these in turn.

## DISCUSSION AND ANALYSIS

## MOTION TO DISMISS THE INDICTMENT

### *"True Threat"*

Defendant moves to dismiss the indictment on the basis that his alleged Facebook post "Let's Start Killin Police Lets See How Dey Like It [sic]" does not constitute a "true threat" as a matter of law. Dkt. No. 10, pp. 14-15. "A motion to dismiss an indictment must meet a high standard." *United States v. Lazore*, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000). As a general rule, an indictment is sufficient if it contains the elements of the offense charged, fairly informs a defendant of the charges against which he must defend, and enables the defendant to plead double jeopardy in the event of further prosecution. *Hamling v. United States,* 418 U.S. 87, 117 (1974); *United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998); *United States v. King*, No. 98-CR-91A, 2000 WL 362026, at *8 (W.D.N.Y. Mar. 24, 2000).

13

To meet this sufficiency standard, an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (internal citations omitted). "[An] indictment does not have to specify evidence or details of how the offense was committed." *United States v. Walters*, 963 F. Supp. 2d 125, 130 (E.D.N.Y. 2013). This is because "the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." *Id.*

"The general issue in a criminal trial is, of course, whether the defendant is guilty of the offense charged." *Alfonso*, 143 F.3d at 777 (citing *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995)). As a general rule, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *Alfonso*, 143 F.3d at 777. For this reason, "there is no federal criminal procedure mechanism that resembles a motion for summary judgment in the civil context." *United States v. Zodhiates*, 166 F. Supp. 3d 328, 344 (W.D.N.Y. 2016) (quoting *United States v. Yakou*, 428 F.3d 241, 246 (D.C.Cir. 2005)). A court may only grant a motion to dismiss a criminal indictment if it can be resolved "without a trial on the merits." *Zodhiates*, 166 F. Supp. 3d at 345 (quoting Fed.R.Crim.P. 12(b)(3)).

When deciding a motion to dismiss, "the court accepts as true the facts alleged in the Indictment and determines only whether the Indictment is 'valid on its face.'" *Lazore*, 90 F. Supp. 2d at 203 (citations omitted); *see also United States v. Falkowitz*, 214 F. Supp. 2d 365, 372 (S.D.N.Y. 2002) (holding that "on a motion to

dismiss made under Rule 12(b), a court assesses the legal sufficiency of an indictment without consideration of the evidence the government may introduce at trial").

In the alternative, an indictment may be dismissed on a pretrial motion where the material facts are undisputed, there is no government objection, and only an issue of law remains, *see, e.g., United States v. Phillips*, 367 F.3d 846 (9th Cir. 2004); *United States v. Hall*, 20 F.3d 1084 (10th Cir. 1994); *United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988); where the government has made a complete proffer of evidence; or where there is a stipulated record, *see, e.g., United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000); *Alfonso*, 143 F.3d at 772.


"A conviction under § 875(c) requires the specific intent to threaten . . . and only true threats may be prohibited." *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (internal citations omitted). Defendant argues that the Indictment must be dismissed because his Facebook post was not a "true threat," but rather political speech, which is "entitled to especially robust First Amendment protection, . . . even when it is raw, offensive or venomous." Dkt. No. 10, p. 15. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Liability under 18 U.S.C. § 875(c) turns on the "vital element of scienter;" *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015), which "is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.*

To the extent that defendant's motion to dismiss requires this Court to determine what was going through Jordan's mind when he published his Facebook post "Let's Start Killin Police Lets See How Dey Like It [sic]," the undersigned declines to do so.  The Indictment against Jordan states as follows:

> On or about July 6, 2016, in the Western District of New York, the defendant, ARTHUR JORDAN, did knowingly and willfully transmit, in interstate and foreign commerce, that is, through the internet, a communication on Facebook, a social media website, containing a threat to injure one or more police officers, that is, the defendant posted on Facebook "Let's Start Killin Police Lets See How Dey Like It." All in violation of Title 18, United States Code, Section 875(c).

Dkt. No. 6.

The Indictment contains the elements of the offense and alleges facts – including facts from which Jordan's *means rea* could be inferred – that are facially sufficient to survive a motion to dismiss.  The parties have not stipulated to the material facts in this case and there has been no proffer of evidence.  Therefore, questions of fact exist as to whether defendant intended to convey a threat or knew that the BPD would view his post as a threat when he published it or if he was simply engaged in "mere political hyperbole."  These are questions of fact that must be reserved for a jury. *See United States v. Wright-Darrisaw*, 781 F.3d 35, 39 (2d Cir. 2015) (stating that "whether words used are a true threat is generally best left to the triers of fact") (internal citations omitted); *see also United States v. Turner*, 720 F.3d 411, 419 (2d Cir. 2013) (recognizing that "[i]n general, 'whether a given writing constitutes a threat is an issue of fact for the trial jury'") (quoting *United States v. Davila*, 461 F.3d 298, 304 (2d Cir. 2006); *see also United States v. Carrier*, 672 F.2d 300, 306 (2d Cir. 1982) (stating that

"[m]ost cases [involving alleged threats] are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury"). Accordingly, defendant's motion to dismiss the Indictment on this basis should be denied.

## Overbreadth

Defendant next argues that 18 U.S.C. § 875(c) is substantially overbroad in that it "criminalizes a substantial amount of protected activity." *United States v. Williams*, 553 U.S. 285, 293 (2008). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law," unless it can be saved by a limiting construction. *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal citations and quotations omitted). Because invalidating a statute is considered "strong medicine," a party challenging a statute on overbreadth grounds must show "*substantial* infringement of speech." *United States v. Farhane*, 634 F.3d 127, 136-37 (2d Cir. 2011) (quoting *Williams*, 553 U.S. at 292) (emphasis in the original).

18 U.S.C. § 875(c) makes it a crime to transmit in interstate commerce "any communication containing any threat to kidnap any person or any threat to injure the person of another." Courts have held that only "true threats" made with the specific intent to threaten are actionable under the statute. A communication is considered a "true threat" only if "an ordinary, reasonable person who is familiar with the context of the communication would interpret it as a threat of injury." *Turner*, 720 F.3d at 420; *see*

*also United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997) (recognizing the objective "true threats" test applied to cases charged under 18 U.S.C. § 875(c)).  And as previously noted, a speaker is liable under 18 U.S.C. § 875(c) only if he or she makes the communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."  *Elonis*, 135 S.Ct. at 2012.  This limiting judicial construction ensures that protected free speech does not fall within 18 U.S.C. § 875(c)'s legitimate sweep.  For this reason, defendant's motion to dismiss the indictment on the basis of statutory overbreadth should be denied.

<u>Void for Vagueness</u>

Defendant argues that 18 U.S.C. § 875(c) is unconstitutionally vague and standardless and "invites arbitrary and discriminatory enforcement by government officials."  Dkt. No. 10, pp. 17-18.  A statute is unconstitutionally vague, and runs afoul of the Due Process Clause of the Fifth Amendment, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Williams*, 553 U.S. at 305.  The mere fact that reasonable minds may disagree as to whether a particular statement falls within the purview of 18 U.S.C. § 875(c) does not render the statute unconstitutionally vague.

As previously discussed, courts have narrowed the type of speech which may be prosecuted under 18 U.S.C. § 875(c).  A conviction requires that the communication must constitute a "true threat," *Virginia v. Black,* 538 U.S. at 359-60,

spoken with the specific intent to threaten, *United States v. Twine,* 853 F.2d 676, 680 (9th Cir.1988). This "narrowing construction provided by the relevant cases actually alleviates possible void-for-vagueness concerns." *Sutcliffe*, 505 F.3d at 953 (citing *Boos v. Barry,* 485 U.S. 312, 329-30 (1988)). Accordingly, it is recommended that defendant's motion to dismiss the indictment on vagueness grounds be denied.

## MOTION TO SUPPRESS

### *Facebook Posts*

Defendant moves to suppress the warrantless search of his Facebook "profile and wall," during which his post was discovered. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. An individual challenging the constitutionality of a search must show by a preponderance of the evidence that he or she has a legitimate expectation of privacy in the particular area searched or in the items seized. *United States v. Pena Ontiveros*, 547 F. Supp. 2d 323, 329 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 F. App'x 441 (2d Cir. 2011) (citing *Minnesota v. Carter,* 525 U.S. 83, 87-88 (1998); *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980); *Rakas v. Illinois,* 439 U.S. 128, 133-39 (1978); *United States v. Watson,* 404 F.3d 163, 166 (2d Cir. 2005)). To be legitimate, the person must meet both a subjective and objective element, that is, he or she must show: (1) a subjective expectation of privacy in the object seized; and (2) that society accepts as legitimate that expectation of privacy. *California v. Ciraolo,* 476 U.S. 207, 211 (1986).

"Generally, people have a reasonable expectation of privacy in the contents of their home computers."  *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (citing *United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir. 2004)). However, this privacy expectation is not absolute, "and may be extinguished when a computer user transmits information over the Internet or by e-mail."  *Meregildo,* 883 F. Supp. 2d at 525.  In the context of Facebook, a person who allows a wide circle of "friends" to access his profile does not have a reasonable expectation of privacy. *Meregildo,* 883 F. Supp. 2d at 525.  This is because once a user disseminates a post to his "friends," those "friends," being under no obligation to keep his profile private, are free to share that information anyway they like.  *See, e.g., Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001).  For this reason, a person who shares a post with his "friends" surrenders his expectation of privacy and does so "at his own peril."  *Meregildo*, 883 F. Supp. 2d at 525.

According to the search warrant affidavit, Jordan had 1,965 friends at the time that law enforcement took screen shots of his "Let's Start Killin Police" post.  Dkt. No. 10-1, p. 14, fn. 1.  Jordan testified at the grand jury that he did not know many of his Facebook "friends," but accepted their requests because he "[m]ight get to know them." Dkt. No. 13, pp. 11-12.  This Court finds it patently unreasonable that Jordan would have any expectation of privacy in a post published to this expansive circle of near strangers.  For this reason, defendant's motion to suppress his Facebook posts should be denied.

*The Search of Jordan's Person*

A police officer may briefly detain an individual provided that the officer has "reasonable suspicion, based on specific and articulable facts," *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994), "that criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  *Terry*'s reasonable suspicion standard is decidedly less demanding than the probable cause standard needed to conduct a warrantless search.  *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (recognizing that reasonable suspicion, while requiring at least a minimal level of objective justification for making the stop, requires less of a showing than probable cause); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (holding that probable cause means "a fair probability that contraband or evidence of a crime will be found" and "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause") (internal citations omitted).  When effectuating such a stop, the officer may "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  *United States v. Jaramillo,* 25 F.3d 1146, 1150–51 (2d Cir. 1994) (quoting *Terry,* 392 U.S. at 23).

"Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons'. . . ."  *Ybarra v. Illinois,* 444 U.S. 85, 93-94 (1979).  Rather, a *Terry* stop and frisk is limited in scope and is justified only under certain circumstances.  That is, an officer may conduct a "carefully limited search of an individual's outer clothing," also known as a "pat frisk" search, only "[w]hen [the] officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and

presently dangerous to the officer or to others."  *Terry,* 392 U.S. at 24, 30.  "The 'narrow scope' of the *Terry* exception [to the Fourth Amendment's requirement of probable cause] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . ."  *Ybarra,* 444 U.S. at 94.

In deciding whether a *Terry* stop is reasonable under the Fourth Amendment, a reviewing court must determine, first, "whether the officer's action was justified at its inception, and [second], whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000) (citing *Terry*, 392 U.S. at 20).  This assessment is made considering "the totality of the circumstances" surrounding the stop, *Sokolow*, 490 U.S. at 8, "through the eyes of a reasonable and cautious police officer on the scene."  *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Bayless*, 201 F.3d at 133).  A "pat frisk" search that is supported by reasonable suspicion "is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken."  *Terry*, 392 U.S. at 30-31.  On the other hand, any evidence that is seized during an illegal stop and frisk "is subject to the fruit of the poisonous tree doctrine," and may be suppressed.  *Scopo*, 19 F.3d at 781 (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)).

This Court finds that the BPD were arguably justified in stopping Jordan based on the station house notice that FBI Safe Streets wanted to question him about

his Facebook post.  However, the officers' conduct in manhandling Jordan and frisking

him went far beyond the circumstances that justified Jordan's initial detention.

        The defendant makes much of the fact that there was no active arrest

warrant for Jordan and that he posted his alleged threat over one week prior to his

encounter with the BPD.[7]  However, that the FBI lacked probable cause to arrest Jordan

for making online threats or that he arguably already consummated his crime did not

strip the BPD of their legal authority to stop and question Jordan.  The United States

Supreme Court has held that a law enforcement agency is entitled "to act on the basis

of a flyer indicating that another department has a reasonable suspicion of involvement

with a crime."  *United States v. Hensley*, 469 U.S. 221, 231 (1985).  "The law

enforcement interests promoted by allowing one department to make investigatory

stops based upon another department's bulletins or flyers are considerable, while the

intrusion on personal security is minimal."  *Hensley*, 469 U.S. 221, 232.  Moreover, "the

police are not automatically shorn of authority to stop a suspect in the absence of

probable cause merely because the criminal has completed his crime . . . ."  *Hensley*,

---

[7] Defendant also argues that the BPD did not have reasonable suspicion to believe that Jordan
had committed a crime because his post, "Let's Start Killin Police Lets See How Dey Like it" did
not constitute a "true threat."  Dkt. #26, p. 11.  Whether Jordan's Facebook activity falls squarely
within the legal definition of 18 U.S.C. § 875(c) is not the test for whether BPD could stop and
question him about it.  FBI Safe Streets articulated its reasons for believing that Jordan was
threatening police officers – specifically, his Facebook post, his gang affiliations – and the BPD
was entitled to rely on the agency's notice in initially detaining him.

469 U.S. at 228;[8] *see also United States v. Place*, 462 U.S. 696, 702 (1983) (stating that an officer may briefly detain a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity).

       The lesser governmental interest in investigating suspected past criminal activity, compared with ongoing criminal conduct, does, however, limit how much an officer may intrude on a person.

> A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Hensley*, 469 U.S. at 228-29 (citing *Brown v. Texas,* 443 U.S. 47, 51 (1979)). Consistent with this reasoning, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, . . . to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Hensley*, 469 U.S. at 232 (citing *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 400-01 (7th Cir. 1975)); *see also Adams v. Williams,* 407 U.S. 143, 146 (1972) (holding that "[a] brief stop of a suspicious

---

[8] In the alternative, a reasonable interpretation of the notice was that FBI Safe Streets wanted to question Jordan about a possible plan or conspiracy to kill officers, an ongoing crime or one that was going to be committed.  These were (and arguably remain) tumultuous times for relations between police officers and the black community.  Days after Jordan published his post, a sniper had gunned down several officers in Dallas, TX, and the FBI's notice reported that Jordan was "possibly armed and dangerous."

individual, in order to determine his identity or to maintain the status quo momentarily

while obtaining more information, may be the most reasonable in light of the facts

known to the officer at the time")).  It does not, in the absence of reasonable suspicion

that a person is presently armed and dangerous, authorize an officer to search a person

for weapons or contraband.

Having reviewed the surveillance videos of Jordan's interaction with the

police, I find that there was no legitimate basis based on a totality of the circumstances

for the officers to restrain, manhandle, and frisk Jordan for weapons.  As an initial

matter, the officers' prior experience with Jordan made it far less likely that Jordan was

"possibly armed and dangerous" as the FBI notice suggested.  Officers Acquino and

Hamilton had never known Jordan to possess weapons or behave violently, 12/8/16 Tr.

at 26, 38, & 47, and characterized him as a "very cordial" young man, who did not talk

back or make threats like some of his gang affiliates.  12/8/16 Tr. at 6, 65.  Although

Officer Hamilton testified that after seeing the police cruiser, Jordan and his friends

became nervous, started walking faster, looked behind them repeatedly and ducked into

to the PCS Metro store to avoid them, the exterior surveillance video seems to

contradict this characterization, instead showing the men walking casually, conversing

with each other, and never once looking behind them.

As previously detailed herein, *supra* pp. 7-10, the interior videos from the

PCS Metro Store contradict Officer Acquino's claims that Harwell was merely

pretending to have legitimate business with the PCS Metro Clerk, that Wilson was

faking a conversation on his cell phone, and that Harwell was interjecting himself into

the situation to deflect attention away from Jordan.  That Harwell and Wilson were

allegedly "nervous" when the four officers entered the small store, fanned out and

blocked their exit, while Officer Hamilton put on his black gloves, does not support the

conclusion that Jordan was presently armed and dangerous.  As I observed at the

suppression hearing,

> You can't say well, the police officer can have his suspicions and be
> nervous but the defendant cannot have his suspicions and be nervous.  It
> can't just be one way.
> We all know – psychologists will testify that in the African-American
> community, young people, especially young men, when they see police
> have a different reaction [of] fear . . . because they know there are police
> who will beat them up or who will shoot them, and they act accordingly.
> They act nervously.  They run.  They hide.  Does that mean they are
> engaged in criminal activity?

12/8/16 Tr. at 87.   Given the tensions between the black community and the police at

that time, any nervousness exhibited by Wilson or Hartwell was understandable.  Even

the PCS Metro clerk, who was not alleged to be involved in any criminal activity,

appeared distracted and nervous about the police presence in the store.

       The officers testified that they were suspicious because Wilson had been

arrested two years before with a revolver and Harwell had been known to loiter at

known CPG hangouts.  But Harwell and Wilson were not the targets of the FBI notice or

the officers' attentions at the PCS Metro Store.  "The 'narrow scope' of the *Terry*

exception does not permit a frisk for weapons on less than reasonable belief or

suspicion directed **at the person to be frisked** . . . ."  *Ybarra*, 444 U.S. at 93-94

(emphasis added).  Here is where the government's evidence falls short.  The

government's proffer of reasonable suspicion, which focuses primarily on Wilson and

Harwell's criminal histories and conduct, fails to demonstrate that the officers had a

reasonable basis to suspect **Jordan** was armed and dangerous.  It bears noting that

both Harwell and Wilson were, by all accounts, totally compliant with the officers.  Both

men had been frisked in a cursory manner and directed out of the store before the

officers laid hands on Jordan.

            For Jordan's part, the video shows that he was facing the officers with his

hands clearly visible – either stretched out away from his sides or in surrender.  At no

time does he make a furtive movement or reach for his back pocket or waistband.[9]

Officer Acquino explicitly testified that he never saw Jordan's backside and therefore,

did not observe anything in his back pocket before the three officers forcibly turned

Jordan over on the counter.  12/8/2017 Tr. at 48.  The mere fact that Jordan was

leaning against the counter did not justify a frisk, even when he crossed his arms in

what Officer Acquino described as a "defiant stance."  12/8/16 Tr. at 24.  A "refusal to

cooperate[10] . . . without more, does not furnish the minimal level of objective justification

---

[9] In this regard, the circumstances of Jordan's seizure are wholly distinguishable from those in
*United States v. Oglesby*, 597 F.3d 891, 894-95 (7th Cir. 2010), a case cited to by the
government for the proposition that a defendant's conduct in angling his body can support an
officer's reasonable suspicion that he is armed and dangerous.  In *Oglesby*, the suspect was
present in a high crime area at night; he retreated from the group when the officers approached,
looking from side to side; he angled his body to the side and "repeatedly lowered his right hand
toward the right pocket of his pants."  *Oglesby*, 597 F.3d at 895.  Other than leaning against a
counter, Jordan did not engage in any of the arguably evasive or "suspicious" behaviors that
Oglesby did, did not appear nervous, and never reached in his pockets or waistband.
[10] Jordan's refusal to go with Officer Acquino distinguishes this case from *United States v.
McCargo*, 464 F.3d 192 (2d Cir. 2006), which the Second Circuit Court of Appeals held that the
police were justified in conducting a suspicionless search of a suspect who agreed to be
transported for a show up identification pursuant to a departmental policy that any civilian riding
in a patrol car must be searched for weapons.  *McCargo* concerns itself with administrative
searches, which are not at issue here.

needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).  As

defendant argues, there were many legal options open to the officers other than

performing a forcible search.  Dkt. No. 26, p. 17.  They could have detained Jordan for a

short while longer until they contacted the FBI, given the FBI contact information to

Jordan, or followed Jordan after he left the PCS Metro store and reported his

whereabouts to the FBI.


       This Court has no reason to doubt that Officers Acquino and Hamilton

subjectively suspected that Jordan was "defensive" and "was trying to hide something."

12/8/2016 Tr. at 66-67.  The circumstances of the encounter may well have supported

Officer Acquino's "pretty good guess" (12/8/2016 Tr. at 47) that Jordan was armed, a

suspicion that was confirmed when he felt the gun in Jordan's back pocket.  However,

reasonable suspicion is not satisfied by a hunch, intuition or inchoate suspicion.

*Sokolow*, 490 U.S. at 7; *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015).

Officers Acquino and Hamilton failed to articulate facts that support an objectively

reasonable belief that Jordan was armed and dangerous so as to justify a search of his

person.  *See, e.g., United States v. Hussain*, 835 F.3d 307, 314-15 (2d Cir. 2016) (in

case involving a search of a car during a traffic stop, holding that "[w]hatever extra fact

prompted [the officers] to harbor a suspicion of dangerousness that we might accept as

reasonable, it was left unsaid on the record before us").  Accordingly, it is recommended

that defendant's motion to suppress the gun found on his person be granted.

*Jordan's Post-Arrest Statements*

The exclusionary rule is applied to evidence obtained directly and indirectly from an unlawful search and seizure. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Suppression is not required where the connection between the illegal conduct of the police and the discovered evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). The government bears the burden of showing that a statement is sufficiently attenuated from an officer's unlawful conduct. *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

As the United States Supreme Court explained in *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975):

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered.

*Id.* Generally speaking, however, the factors a court considers to determine whether a statement taken after an illegal arrest or detention constitutes an act of free will include: the temporal proximity between the illegal seizure and statement; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct. *Brown,* 422 U.S. at 603-04.

Jordan made two statements – one to his arresting officers on July 14, 2016, and one to the FBI the following day.  According to Officer Hamilton's grand jury testimony,[11] Jordan was placed in the back of the patrol car within a minute of being pepper sprayed.  Def.'s Exh. 1, p. 10.  Jordan was swearing and agitated from the encounter.  *Id.*  Officer Hamilton read Jordan the *Miranda* warnings and advice of rights while Jordan's eyes were still closed.  *Id.* at 10-11.  Jordan twice stated that he could not talk because his eyes were burning and he needed to clean the pepper spray from his eyes.  *Id.* at 11.  The officers advised Jordan that they would "clean his eyes once we get to central booking," but they began the "decontamination process" by rolling the windows of the patrol car down.  *Id.* at 11.  Jordan was spitting and swearing, but the officers pressed forward, questioning Jordan over the next half hour or so.  *Id.* at 11-20.  They eventually got a statement from Jordan to the effect of, "I should have done some CNN shit."  *Id.* at 14.  The officers thereafter brought Jordan to central booking in downtown Buffalo.  Def.'s Exh. 1, p. 18.

This Court finds that the factors articulated in *Brown* weigh in favor of excluding Jordan's statement to Officers Acquino and Hamilton.  It is undisputed that Jordan's statements were made within minutes of his illegal detention during which he was manhandled by several officers, maced, and then punched in the head twice while handcuffed.  Jordan's eyes were still burning so badly from the pepper spray, he could not even open them when Officer Hamilton – one of the arresting officers – *Mirandized* him.  Officers Acquino and Hamilton made clear that they would not help Jordan, save

---

[11] This grand jury testimony was submitted to this Court as Defendant's Exhibit 1 during the suppression hearing.

opening the window to the cruiser.  It is unlikely that this had any effect, given that the

PCS Metro clerk (who had not been directly sprayed) had to leave the store entirely to

escape the chemicals.  They continued to interrogate Jordan, despite his apparent

incapacitation, for approximately a half an hour before delivering him to central booking.

The government has cited to no intervening act or temporal lag showing that Jordan's

illegal seizure was somehow attenuated from his July 14, 2016 post-arrest statement.

For this reason, it is recommended that this statement be suppressed.


        The same cannot be said about the statement Jordan made to the FBI the

day following his arrest.  This Court finds that the taint of Jordan's illegal arrest was

sufficiently dissipated when he made his second, less incendiary statement to the FBI

that he published the post "because he was mad about what was going on around the

country."  Dkt. No. 10-1, p. 17.  At least twelve hours had passed since Jordan was

illegally seized at the PCS Metro store, he was no longer suffering the immediate effects

of the pepper spray, and Agents DiPasquale and Maiola (who were not involved in

Jordan's arrest) once again advised Jordan of his rights in accordance with *Miranda*.

Dkt. No. 10-1, pp. 16-17.


*Evidence Derived from the Search of Jordan's Facebook Account Pursuant*
*to the July 29, 2016 Facebook Warrant*

        Evidence derived from an illegal search or seizure cannot form the basis

for probable cause in a search warrant affidavit.  *United States v. Trzaska*, 111 F.3d

1019, 1025 (2d Cir. 1997); *United States v. Vasey*, 834 F.2d 782, 288 (9th Cir. 1987).

When it is determined that evidence set forth in a warrant application was illegally

obtained, the reviewing court must excise that evidence and determine whether the remaining content establishes probable cause. *Trzaska*, 111 F.3d at 1025; *United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996).  For the reasons previously stated, this Court finds that Jordan was unlawfully detained on July 14, 2016, and the statements he made immediately following his arrest were not attenuated from that illegality.  As such, the paragraphs detailing his arrest, the seizure of the gun, and the post-arrest statements must be redacted from FBI Agent Keith Bender's warrant application for Jordan's Facebook account.  Dkt. No. 10-1, pp. 15-16, ¶¶ 31-32, 34. What remains in support of probable cause are the following investigatory facts:  on July 7, 2016, a law enforcement officer reviewed Jordan's Facebook profile and saw the post "Let's Start Killin Police Lets See How Dey Like It;" Jordan allegedly "shared" a post authored by another person which stated, "Its just a matter of time before Fitz or one them fools kill 1 of us;" "Fitz" was believed to be a Buffalo Police Officer assigned to E-District in the City of Buffalo, who had "had police related interactions" with the CPG in the past; and on July 7, 2016, Agent Bender visited Jordan's residence, where Jordan's father confirmed that Jordan had used his cell phone to make the posts; Jordan's father reported that he told his son to remove the offending posts from his Facebook account; on July 15, 2016, during an interview with the FBI, Jordan admitted that he had published the Facebook posts using his iPhone because he was "mad" about what was going on in the country.  Dkt. No. 10-1, pp. 14-15, ¶¶ 27-30, 33.

Defendant argues that these remaining facts do not support probable cause to believe that evidence of making an interstate threat would be found in his

Facebook account.  He contends that the "Let's Kill Police" and "Fitz" posts were

"political hyperbole, rather than . . . evidence of criminality."  Dkt. No. 26, p. 23.

Whether there is enough evidence to ultimately convict Jordan of making an interstate

threat within the meaning of 18 U.S.C. § 875(c) is not the standard for the issuance of a

search warrant.  The issue was whether there was probable cause to believe that

Jordan's Facebook account contained evidence of interstate threats.


       The "Fourth Amendment does not require probable cause to believe that

evidence will *conclusively* establish a [particular] fact . . . ."  *Messerschmidt v. Millender*,

565 U.S. 535, 522 n.7 (2012).  Rather, probable cause is satisfied when, based on a

totality of the circumstances and given all of the available facts "viewed through the lens

of common sense," a "reasonably prudent person [would] think that a search would

reveal contraband or evidence of a crime."  *Florida v. Harris*, 568 U.S. 237, 248 (2013).

This Court finds that given Jordan's self-professed anger about black men

being killed by police, the fact that he posted on his Facebook page about killing officers

and re-shared a post about an officer with whom the CPG had had encounters, there

was a reasonable probability that a search of his Facebook account would yield

evidence of criminal threats.  For this reason, defendant's motion to suppress the

evidence discovered during the search of his account pursuant to the July 29, 2016

Search Warrant should be denied.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's Motion to Dismiss and to Suppress (Dkt. No. 10) be GRANTED in part and DENIED in part, as follows:

That defendant's motion to dismiss the Indictment be DENIED;

That defendant's motion to suppress evidence seized from his person on July 14, 2016 be GRANTED;

That defendant's motion to suppress his post arrest statements be GRANTED with respect to his July 14, 2017 statement, but DENIED with respect to his July 15, 2016 statement; and

That his motion to suppress the content of his Facebook account be DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P.

72(b)(2) and Local Rule 72. **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988). In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the

District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

**SO ORDERED.**

DATED:      Buffalo, New York
            July 14, 2017


                                        _s/ H. Kenneth Schroeder, Jr._
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**